UNITED STATES of America,
Plaintiff-Appellee,

v.

Bobbie STANFORD, Louis Watson, Janice Davis, Estella Patterson, Doris Beverly, Dorothy Fife, Richard O'Rourke, and Dorothy Jones, Defendants-Appellants.

Nos. 77–2092, 77–2166, 77–2168, 78–1155, 78–1276, 78–1475, 78–1594 and 78–1938.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 13, 1978.

Decided Dec. 14, 1978.

Carol A. Brook, Federal Defender Program, Chicago, Ill., for defendants-appellants.

Thomas P. Sullivan, U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before PELL, Circuit Judge, NICHOLS, Associate Judge,[*] and SPRECHER, Circuit Judge.

PELL, Circuit Judge.

The defendants appeal from their convictions for mail fraud in violation of 18 U.S.C. § 1341 and making false statements in violation of 18 U.S.C. § 1001. The proof at their trials showed that the defendants received benefits from the Illinois Department of Public Aid (IDPA) after having made false statements about their income from other sources, namely, employment with one of the federal or local government agencies in this area. All of the defendants received IDPA warrants, and some defendants also received authorizations to purchase food stamps. We shall describe the facts in detail as they become pertinent to our discussion of the issues.

The defendants' allegations of error pertain to four subjects: the grand jury investigation, the legal sufficiency of the mail fraud indictments, the legal sufficiency of the false statements indictments, and prosecutorial misconduct. The defendants ask that we either suppress evidence against them or dismiss their indictments.

## I. *The Grand Jury Investigation*

The Special November 1975 Grand Jury indicted the defendants on June 21, 1977, after a year-long investigation of alleged welfare fraud among government employees in Illinois. Because of the complexity of the welfare laws and the broad coverage of the investigation, the grand jury used computer experts, accounting technicians, and welfare eligibility experts to aid in the investigation. The defendants argue that the disclosure of grand jury evidence to these agents violates the secrecy requirements of Fed.R.Crim.P. 6(e).[1] At a later stage of the investigation, federal agents interviewed the defendants and at these interviews presented documents obtained by grand jury subpoena. The defendants object, also on the basis of Rule 6(e), to the disclosure of these documents to them. As a remedy for these alleged violations of Rule 6(e), the defendants request that we dismiss their indictments or, in the alternative, suppress their confessions. Because the arguments of the parties are best understood with a full knowledge of the course of the grand jury investigation, we shall first summarize the facts pertaining thereto.

During the first stage of the investigation, the grand jury subpoenaed the employee lists of various federal and local governmental agencies.[2] These lists were to be fed into IDPA computers for interfacing with lists of recipients of IDPA benefits. On October 26, 1976, prior to receiving the subpoenaed employee lists, the grand jury

---

[*] Judge Philip Nichols, Jr., of the United States Court of Claims is sitting by designation.

1. At the time of this investigation, Rule 6(e) provided:

 Secrecy of Proceedings and Disclosure. Disclosure of matters occurring before the grand jury other than its deliberations and the vote of any juror may be made to the attorneys for the government for use in the performance of their duties. Otherwise a juror, attorney, interpreter, stenographer, operator of a recording device, or any typist who transcribes recorded testimony may disclose matters occurring before the grand jury only when so directed by the court preliminarily to or in connection with a judicial proceeding or when permitted by the court at the request of the defendant upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury. No obligation of secrecy may be imposed upon any person except in accordance with this rule. The court may direct that an indictment shall be kept secret until the defendant is in custody or has given bail, and in that event the clerk shall seal the indictment and no person shall disclose the finding of the indictment except when necessary for the issuance and execution of a warrant or summons.

 Rule 6(e) was amended on August 1, 1978. It now expressly provides for disclosure without a court order to government personnel assisting government attorneys in performing their duties. The rule also requires government attorneys to record the names of persons to whom disclosure is made and restricts the use of materials to grand jury purposes.

2. Among the agencies subpoenaed were the Chicago Transit Authority, the City of Chicago, Cook County, the General Services Administration, and the Postal Service.

swore as agents an IDPA employee with expertise in the use of the IDPA computer and an FBI special agent. On November 19, 1976 Chief Judge Parsons issued a disclosure order under Rule 6(e) permitting disclosure to employees of IDPA. On December 3, 1976 the grand jury swore another FBI special agent and three more IDPA employees as agents of the grand jury. The grand jury received the subpoenaed employee lists on the same day and presented the lists to the IDPA employees for the interfacing process.

The second stage of the grand jury investigation commenced in January 1977 when the grand jury received under subpoena additional employment records from the various federal and local government agencies. In late January, the grand jury swore FBI accounting technicians as agents for the purpose of examining these records.

When the IDPA employees completed the computerized interfacing of employee lists and IDPA beneficiary lists, the grand jury began the third stage of its investigation. The list of individuals simultaneously employed and receiving IDPA benefits required the scrutiny of IDPA quality control experts to determine whether any of the recipients were ineligible for benefits. The grand jury therefore swore several of these experts from the IDPA as agents between February 25, 1977 and March 18, 1977. These experts eventually presented worksheets to the grand jury on those persons from the list who were ineligible to receive benefits.

Prior to the final stage of the investigation, Chief Judge Parsons entered two more disclosure orders under Rule 6(e). The first of these, entered March 19, 1977, permitted disclosure of transcripts and subpoenaed materials to federal officers and Illinois Department of Law Enforcement personnel.

The second of these orders, issued May 2, 1977, permitted disclosure to IDPA employees.

During the final stage of the investigation, agents of the FBI, the Postal Inspection Service, and the Illinois Bureau of Investigation interviewed many individuals who were suspected of welfare fraud. All of the defendants were interviewed during this stage. During these interviews the agents confronted each of the defendants with IDPA applications and redetermination of eligibility forms, warrants from the Illinois Comptroller, and employment records.[3] All of the documents used at each interview were obtained by grand jury subpoena,[4] but pertained only to the defendant interviewed. The purpose of presenting these documents was to verify the signatures and to discover the state of mind of each defendant when making the application for and receiving benefits. The defendants were given *Miranda* warnings at the beginning of the interviews, and each of them signed a written confession.

We shall discuss first the defendants' objection to the disclosures made to them during these interviews. The grand jury did not obtain an order under Rule 6(e) permitting disclosure of the subpoenaed documents to the defendants, and the defendants argue that showing these documents to them without this judicial imprimatur violates Rule 6(e).

▮ Underlying the defendants' argument is the assumption that Rule 6(e) shields every item of evidence considered by the grand jury, whether or not obtained by subpoena, with an impenetrable cloak of secrecy. The defendants' theory requires a court order to expose every item of evidence once it has appeared before the grand jury.[5] This argument does restate the general rule, *see United States v. Procter &*

---

**3.** Although the briefs do not make this fact very clear, we accept as true the stipulation below that employment records were shown to the defendants at the interviews.

**4.** Although the United States submitted on appeal that the IDPA documents were voluntarily presented to the grand jury, we accept as true

the stipulation in the record that these documents were obtained by subpoena.

**5.** Both the prior and current versions of the Rule, of course, contain express exceptions to the court order requirement for disclosure to government attorneys.

Gamble, 356 U.S. 677, 682, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958); In re Holovachka, 317 F.2d 834, 836–37 (7th Cir. 1963), but neither the language nor the purpose of Rule 6(e) requires the secrecy to be absolute.

The restrictions of Rule 6(e) apply only to "disclosure of matters occurring before the grand jury." Unless information reveals something about the grand jury proceedings, secrecy is unnecessary.

Thus, when testimony or data is sought for its own sake—for its intrinsic value in furtherance of a lawful investigation—rather than to learn what took place before the grand jury, it is not a valid defense to disclosure that the same documents had been, or were presently being, examined by a grand jury.

United States v. Interstate Dress Carriers, 280 F.2d 52, 54 (2d Cir. 1960). Unlike testimony, documents are created for purposes other than the grand jury investigation; they are therefore more likely to be useful for purposes other than revealing what occurred before the grand jury. See Illinois v. Sarbaugh, 552 F.2d 768, 772 n.2 (7th Cir.), cert. denied, 434 U.S. 889, 98 S.Ct. 262, 54 L.Ed.2d 174 (1977).[6] Persons may have a legitimate interest in documents so that disclosure to them does not constitute disclosure of matters occurring before the grand jury. See United States v. Weinstein, 511 F.2d 622 (2d Cir.) cert. denied, 422 U.S. 1042, 95 S.Ct. 2655, 45 L.Ed.2d 693 (1975); United States v. Interstate Dress Carriers, supra; In re Grand Jury Investigation of Ven-Fuel, 441 F.Supp. 1299 (M.D. Fla.1977); Capitol Indemnity Corp. v. First Minnesota Construction Co., 405 F.Supp. 929 (D.Mass.1975); In re Hearings Before Committee on Banking and Currency, 19 F.R.D. 410 (N.D.Ill.1956).

The disclosures challenged here revealed nothing about the grand jury investigation, and the disclosures were made only to persons legitimately connected with the documents. The documents revealed to the defendants were not described by the agents during the interviews as grand jury documents.[7] Each defendant was shown only his or her own employment file, his or her own welfare applications, and his or her own endorsement on the warrants. For these reasons, the disclosure falls outside of the scope of Rule 6(e). Because the documents shown were not otherwise sheltered from the defendants' inspection by any form of privilege, cf. United States v. Weinstein, supra, at 627; In re Grand Jury Investigation, 210 F.Supp. 904 (S.D.N.Y.1962), the defendants' challenge to these disclosures must fail.

The defendants also urge that Rule 6(e) did not permit the disclosures without a court order to FBI agents and accounting technicians.[8] The version of Rule 6(e) applicable to this case permitted disclosure without a court order only to "attorneys for the government." Rule 54(c)[9] defines this

---

**6.** We do not mean to say that disclosure of documents is never subject to Rule 6(e). Cf. United States v. Weinstein, 511 F.2d 622, 627 n.5 (2d Cir.), cert. denied, 422 U.S. 1042, 95 S.Ct. 2655, 45 L.Ed.2d 693 (1975); In re Grand Jury Investigation of Ven-Fuel, 441 F.Supp. 1299, 1303 (M.D.Fla.1977). A general request for "all documents collected or received in connection with the investigation of antitrust violations . . . .," for example, would be in effect a disclosure of the grand jury proceedings; the documents are significant because they were before the grand jury. See Corona Construction Co. v. Ampress Brick Co., 376 F.Supp. 598 (N.D.Ill.1974).

**7.** The defendants allege in their brief that the agents conducting the interviews carried grand jury subpoenas with them. Evidence of this allegation appears in the record. No evidence appears in the record before us, however, to support the allegation that the agents displayed the subpoenas during the interviews.

**8.** The defendants also argue in their brief that grand jury materials were disclosed to IDPA personnel without an order under Rule 6(e). The record shows that an IDPA employee was sworn as an agent of the grand jury on October 26, 1976, prior to the November 17, 1976 court order. The record also shows, however, that no subpoenaed documents were presented to the grand jury until December 3, 1976. The documents were turned over to the IDPA employees at this time.

**9.** Rule 54(c) provides:
"Attorney for the government" means the Attorney General, an authorized assistant of the Attorney General, a United States Attor-

term, and the defendants would have us limit disclosure to those persons described. We do not agree that the drafters intended to inflict so rigid a restriction on disclosure and hold that disclosure to these FBI personnel without a court order was permissible.

One of the purposes of providing government attorneys access to grand jury materials is to aid the grand jury in its investigation. *See In re Perlin*, 589 F.2d 260, 265–267 (7th Cir. 1978); *In re April 1956 Grand Jury*, 239 F.2d 263, 268–69 (7th Cir. 1956). In an extremely complex investigation like this one, the United States Attorney requires the assistance of experts. Here the expertise came from the FBI, another Justice Department agency under the same control as the United States Attorney. When the grand jury takes precautions to preserve secrecy, as it did here by swearing the FBI personnel as agents and cautioning them about the need for secrecy, we see no reason to put an additional barrier between the grand jury and the evidence by interpreting Rule 6(e) to require a disclosure order. *United States v. Evans*, 526 F.2d 701 (5th Cir. 1976); *Coson v. United States*, 533 F.2d 1119 (9th Cir. 1976). *See United States v. Bazzano*, 570 F.2d 1120, 1125 n.7 (3d Cir. 1977); *Robert Hawthorne,*

*Inc. v. Director of Internal Revenue*, 406 F.Supp. 1098, 1123–27 (E.D.Pa.1976).

The defendants argue that the disclosures to state and federal personnel pursuant to court order under Rule 6(e) were also objectionable for two reasons: a grand jury investigation is not a "judicial proceeding" within the meaning of the Rule 6(e) provision for disclosure orders, and the court orders were overbroad. Both of these arguments are without merit.

■ Rule 6(e) permits disclosure orders not only "in connection with" but also "preliminarily to" a judicial proceeding. Although a grand jury proceeding may not itself be "determinable by a court," *Special February 1971 Grand Jury v. Conlisk*, 490 F.2d 894, 897 (7th Cir. 1973), *quoting Doe v. Rosenberry*, 255 F.2d 118, 120 (2d Cir. 1958), it is nevertheless preliminary to such proceedings. *See United States v. Universal Manufacturing Co.*, 525 F.2d 808 (8th Cir. 1975); *In re Special February 1971 Grand Jury v. Conlisk, supra*. Furthermore, we cannot say that the decision to grant these assistants access to the grand jury materials was an abuse of discretion by the district court. *In re April 1956 Term Grand Jury, supra*.

■ The disclosure orders were not overbroad.[10] Although the orders did not de-

---

ney, an authorized assistant of a United States Attorney and when applicable to cases arising under the laws of Guam means the Attorney General of Guam or such other person or persons as may be authorized by the laws of Guam to act therein.

10. The first order, dated November 19, 1976, provided in pertinent part:

that the Illinois Department of Public Aid be and the same hereby is granted access to subpoenaed books, records and transcripts of testimony of said Special November 1975 Grand Jury in its proceedings numbered 76 GJ 1880, in order that it may aid said Grand Jury in determining whether there have been violations of the criminal laws of the United States Code. Said Illinois Department of Public Aid shall make return of their review of such books, records and transcripts of testimony and copies thereof, to said Grand Jury, and shall disclose matters contained in such books, records and transcripts of testimony and copies thereof, only to said Grand Jury, and to the United States Attorney for

the Northern District of Illinois for his performance of his duties with relation to the proceedings numbered 76 GJ 1880 of said Grand Jury.

The second order, dated March 18, 1977, provided in pertinent part:

that federal agents and officials of the Illinois Department of Law Enforcement be granted access to subpoenaed books and records and transcripts, or copies thereof, of the Special February 1975 Federal Grand Jury, Proceeding No. 76 GJ 1880, presently impaneled in this District, which books and records and transcripts, or copies thereof, are in the custody and control of said grand jury, to assist the grand jury in determining whether there have been criminal violations of the United States Code.

The third order, dated May 2, 1977, provided in pertinent part:

that officials of the Illinois Department of Public Aid be granted access to subpoenaed books and records and transcripts, or copies thereof, of the Special February 1975 Federal Grand Jury, Proceeding No. 76 GJ 1880, pres-

scribe individually the recipients of the materials, which admittedly would have been a preferable practice,[11] the orders limited the use of the materials to the purpose of the investigation, thus guarding against the most likely form of abuse. *See In re April 1956 Grand Jury, supra,* at 271. The record also shows that the grand jury followed a general practice of cautioning individually those persons granted access to the materials, describing with specificity their tasks, and inquiring about security measures. That the orders here did not compromise the secrecy of the grand jury investigation is demonstrated by the defendants' failure to show any misuse of the materials. *See Robert Hawthorne, Inc. v. Director of Internal Revenue, supra,* at 1113.

In sum, viewing the various grand jury contentions collectively, and to some considerable extent individually, our acceptance of them could substantially nullify, particularly in a case of any complexity, one of the basic purposes of this body, that of thorough, knowledgeable investigation of the matters before it. This group of lay persons should not be locked into a position which lacks full comprehension of the factual situations as to which they are inquiring. Being of the opinion that the secrecy requirements have not dictated this result here, we decline to do so by judicial gloss.

Finally, the defendants object to the investigation on the ground that the grand jury was unlawfully convened. The Special November 1975 Grand Jury which indicted the defendants was convened pursuant to the Organized Crime Control Act of 1970, Pub.L. No. 91–452, 84 Stat. 922–962 (1970).[12] This Act also provides for the creation of a National Commission on Individual Rights, comprising members of Congress, the Senate, and persons appointed by the President from outside the government.[13] The President has never appointed anyone to this Commission, and the defendants argue that this failure requires dismissal of their indictments on both statutory and constitutional grounds. We disagree.

The appointment of Commission members pursuant to Title XII of the Act is not a condition precedent to the enforcement of the rest of the Act. Title XIII of the Act contains a severability clause,[14] and the Commission's existence is not coextensive with the operation of the rest of the Act,[15] which resolves all doubt about the applicability of the severability clause to this situation. Furthermore, whether appointment of the Commission would have protected the defendants' or anyone else's rights is speculative.[16] The argument that convening the Special Grand Jury without the

ently impaneled in this District, which books and records and transcripts, or copies thereof, are in the custody and control of said grand jury, for the purpose of investigating welfare fraud.

Although the last two orders identified the grand jury incorrectly as the "February 1975" grand jury, this error was corrected nunc pro tunc by an order dated August 25, 1977. We note also that the proceedings were consistently identified properly by number.

**11.** *See also* the current version of Rule 6(e)(2)(B) summarized in note 1 *supra.*

**12.** Title I, § 101(a) of the Act, pertaining to the creation of Special Grand Juries, is codified at 18 U.S.C. § 3331 et seq.

**13.** Title XII, §§ 1201–1211 of the Act, 84 Stat. 960, pertaining to the creation of the Commission, appears at 18 U.S.C. ch. 216.

**14.** Pub.L. No. 91–452, Tit. XIII, § 1301, 84 Stat. 962. The clause provides:

If the provisions of any part of this Act or the application thereof to any person or circumstances be held invalid, the provisions of the other parts and their application to other persons or circumstances shall not be affected thereby.

**15.** The deadline for creation of the Commission was January 1, 1972; Pub.L. No. 91–452, Tit. XII, § 1210, 84 Stat. 960; yet the provision for Special Grand Juries, for example, went into effect immediately, on October 15, 1970. Pub.L. No. 91–452, Tit. I, § 101(a), 85 Stat. 923. Furthermore, the Commission would have ceased to exist sixty days after submitting its final report to the President and Congress.

**16.** The Commission's role under the Act is merely advisory, with no power to regulate the practices of grand juries or to implement changes in their operation. Pub.L. No. 91–452, Tit. XII, § 1204, 84 Stat. 960.

Commission violated the defendant's due process rights therefore is without merit.

## II. The Mail Fraud Indictments

 Each of the defendants was convicted on one or more counts of mail fraud in violation of 18 U.S.C. § 1341.[17] The defendants offer several grounds for challenging their indictments.[18] Their first argument, that federal prosecution of these defendants under the mail fraud statute violates principles of federalism,[19] is without merit. Although the IDPA plays a significant role in the administration of the Aid to Families with Dependent Children (AFDC) program, the United States is responsible for fifty percent of the funding, giving the federal government a strong interest in policing the program for fraud. Use of the mail fraud statute for this purpose does not undermine state-federal relationships. Cf. Rewis v. United States, 401 U.S. 808, 811–12, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971).

 The defendants also argue, however, that the application of the mail fraud

17. The statute provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

18. The following excerpts from an indictment are typical in all parts relevant to our discussion of the issues:

ESTELLA J. PATTERSON, defendant herein, devised and intended to devise a scheme and artifice to defraud the Illinois Department of Public Aid, the United States Department of Health, Education and Welfare, and the citizens of the State of Illinois and the United States of their right to have the Aid to Families with Dependent Children program conducted honestly and free from deceit, corruption and fraud and the State and Federal funds therein disbursed in accordance with the laws of the State of Illinois and the United States.

4. It was part of said scheme and artifice to defraud that the defendant, Estella J. Patterson, would and did make false and fraudulent pretenses and representations, well knowing at the time that they were false and fraudulent, including, but not limited to the following:

(1) Falsely stating on September 20, 1976 in an application for assistance that her last employer had been the Post Office in 1969 and;

(2) Falsely stating on September 20, 1976 in an application for assistance that she had no income the last year (1975), in order to cause the Illinois Department of Public Aid to send State of Illinois warrants to her through the United States mail.

5. It was further a part of said scheme and artifice to defraud, that upon receipt of the State of Illinois warrants fraudulently obtained through the Aid to Families With Dependent Children Program through the United States mail, Estella J. Patterson would cash said warrants and use the proceeds obtained therefrom knowing full well that she was not entitled to receive these benefits.

6. . . . ESTELLA J. PATTERSON, defendant herein, for the purpose of executing the aforesaid scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, and attempting to do so, did knowingly cause to be delivered by mail according to the direction thereon, an envelope containing a State of Illinois Warrant of the following tenor and description:

State of Illinois Warrant No. 1593645, dated January 20, 1977, payable to Estella Patterson, 139 N. Mason, Chicago, Illinois, 60644, in the amount of $261.00;

In violation of Title 18, United States Code, Section 1341.

19. The defendants have based their entire federalism argument on the assumption that the mail fraud indictments charged a fraud on the Illinois General Assistance Program, which is entirely funded and administered by the State of Illinois. Our examination of the indictments reveals, however, that they charged a fraud on the AFDC program, which is funded and administered by both the state and federal governments.

statute to the use of the mails charged in the indictments unduly expands the federal criminal jurisdiction conferred by section 1341. Although each of the defendants here on appeal applied in person for AFDC benefits or made representations of eligibility during personal interviews, they received the IDPA warrants through the mail. It is the receipt of the warrants in this manner that forms the basis of the mail fraud indictments. Although the defendants themselves did not send anything through the mail, they nevertheless *caused* the mails to be used in violation of section 1341. The causation element of mail fraud requires only the commission of an act with knowledge that the use of the mails will follow in the ordinary course of business, or when the use can reasonably be foreseen, even though not actually intended. *Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 98 L.Ed. 435 (1954). Furthermore, the mailing of the warrants to the defendants was sufficiently related to the scheme to defraud to make the conduct punishable under the statute. The use of the mails need not be an "essential" element of the scheme to violate section 1341. *Pereira v. United States, supra*, at 8, 74 S.Ct. 358; *United States v. Keane*, 522 F.2d 534, 551 (7th Cir. 1975), *cert. denied*, 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976). The defendants' arguments that the alleged scheme might have been accomplished without the mails and that the mailing was merely a matter of convenience for the IDPA are therefore unconvincing. The statute requires only that the mails be used "for the purpose" of executing the scheme. *United States v. Maze*, 414 U.S. 395, 400, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974); *United States v. Craig*, 573 F.2d 455, 482 (7th Cir. 1977), *cert. denied*, —— U.S. ——, 99 S.Ct. 83, 58 L.Ed.2d 110 (1978). In *United States*

*v. Maze, supra*, the Supreme Court held that the fruition of a scheme prior to the mailing removed a scheme to defraud from the scope of the mail fraud statute. The defendant in that case had been convicted of mail fraud for use of a stolen credit card to obtain lodgings. The Court noted that the mailings of credit statements at issue were merely for the purpose of adjusting accounts between the motel proprietor, the bank, and the owner of the credit card, and that the defendant's scheme reached fruition when he checked out of the motel. *Id.* 414 U.S. at 402, 94 S.Ct. 645. In contrast, the mailings at issue in this appeal bore a close relationship to the scheme to defraud: the defendants did not profit from their fraud until they received the IDPA warrants through the mail. *See United States v. Keane, supra*, at 552. Furthermore, by eliminating a number of inconvenient visits to IDPA offices, the mailing of the warrants made it easier for the defendants to retain full-time employment and decreased the chance that the schemes would be detected.

The defendants also argue that the indictments fail to allege a scheme to defraud cognizable under section 1341. They characterize the "primary and dominant" description of the scheme to defraud as a "fiduciary fraud" and argue that they owed no fiduciary duty to the alleged victims of the fraud.[20] As a preliminary matter, we must disagree with the defendants' assumption that we can label one part of an indictment as "primary and dominant" and test the sufficiency of the instrument on the basis of that part. The validity of an indictment is tested by examining the instrument as a whole. *Imperial Meat v. United States*, 316 F.2d 435 (10th Cir.), *cert. denied*, 375 U.S. 820, 84 S.Ct. 57, 11 L.Ed.2d 54 (1963).

**20.** Specifically the defendants challenge that part of the indictments that alleges that the defendants

devised and intended to devise a scheme and artifice to defraud the Illinois Department of Public Aid, the United States Department of Health, Education and Welfare, and the citizens of the State of Illinois and the United States of their right to have the Aid to Fami-

lies with Dependent Children program conducted honestly and free from deceit, corruption and fraud and the State and Federal funds therein disbursed in accordance with the laws of the State of Illinois and the United States.

A typical indictment appears in full in note 18 *supra*.

■ The fraudulent nature of a scheme should not be measured by a technical standard. *Blachly v. United States*, 380 F.2d 665, 671 (5th Cir. 1967). "The law does not define fraud; it needs no definition; it is as old as falsehood and as versable as human ingenuity." *Weiss v. United States*, 122 F.2d 675, 681 (5th Cir.), *cert. denied*, 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550 (1941). The defendants have relied incorrectly on the technicalities of the law of fiduciaries as barring prosecution of the defendants under this indictment. Our reading of the indictments as a whole leads us to conclude without doubt that they describe conduct which fails to match the "reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general . . life of members of society." *United States v. Keane, supra*, at 544–45, *quoting Blachly v. United States, supra*, at 671. The mail fraud indictments here charge the defendants with making false statements to the government agencies "well-knowing at the time that they were false . . .," in order to receive welfare warrants through the mail. The indictments also charge that the defendants cashed the warrants and obtained the proceeds, "knowing full well" that they were "not entitled to receive those benefits."

■ The schemes charged in the indictments are identical to the schemes proved at the trials. The instruments thus served well their purpose to inform the defendants of the proof they would have to rebut at trial. *See Russell v. United States*, 369 U.S. 749, 763–64, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); *Hagner v. United States*, 285 U.S. 427, 431, 52 S.Ct. 417, 76 L.Ed. 861 (1932). The only indication that these indictments were insufficient is the

government's failure to prove that the citizens of the State of Illinois and the United States were victimized in the manner described in the indictments. Similarly, in the action against the defendant Doris Beverly, the trial court struck the language from the indictment describing these victims and the manner of their injury.[21] Although the failure of the prosecution to prove the conduct charged in the indictment may often constitute an amendment of the indictment in violation of the Fifth Amendment, *Russell v. United States, supra*, 369 U.S. at 770, 82 S.Ct. 1038, it is well-settled that not every change in the indictment has this effect. *Ford v. United States*, 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793 (1927); *Salinger v. United States*, 272 U.S. 542, 47 S.Ct. 173, 71 L.Ed. 398 (1926); *United States v. Craig, supra; United States v. Spector*, 326 F.2d 345 (7th Cir. 1963). The scheme alleged in the indictments remained exactly the same after the alleged amendments, and the striking did not "burden the charges contained in the indictment." *See United States v. Craig, supra*, at 491; *United States v. Spector, supra*, at 347. The government could not or did not prove that the citizens of Illinois and the United States were victims of the fraud alleged in the indictments, and the striking of these victims from the indictment for failure of proof was not improper. *Salinger v. United States, supra*, 272 U.S. at 491, 47 S.Ct. 173; *United States v. Prior*, 546 F.2d 1254, 1257 (5th Cir. 1977).

### III. *The False Statements Indictments*

The defendants have argued that we must dismiss their indictments under 18 U.S.C. § 1001 [22] because the facts alleged do not involve false statements concerning a "matter within the jurisdiction of any de-

---

**21.** The court struck the following language from the indictment: ". . . and the citizens of the State of Illinois and the United States of their right to have the Aid to Families with Dependent Children Program conducted honestly and free from deceit, corruption and fraud and the State and Federal funds therein disbursed in accordance with the laws of the State of Illinois and the United States."

Language describing two other victims, the IDPA and the Department of Health, Education, and Welfare, remained in the indictments.

**22.** The statute provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false,

partment or agency of the United States," within the meaning of the statute.

In support of this argument the defendants emphasize that the statements concerning eligibility for food stamps and AFDC were made on IDPA forms, that the IDPA alone decided the eligibility of each individual for benefits, and that the record contains no evidence to show the defendants knew of the federal involvement in these programs.

It is the general rule, however, that a statement may concern a matter within the federal jurisdiction described in section 1001, even if the statement is not submitted directly to the federal department or agency involved, and the federal agency involvement is limited to reimbursement of expenditures. *See, e. g., United States v. Candella,* 487 F.2d 1223 (2d Cir. 1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 872 (1974); *United States v. Matanky,* 482 F.2d 1319 (9th Cir.), *cert. denied,* 414 U.S. 1039, 94 S.Ct. 539, 38 L.Ed.2d 329 (1973); *United States v. Waters,* 457 F.2d 805 (3d Cir. 1972); *Ebeling v. United States,* 248 F.2d 429 (8th Cir.), *cert. denied,* 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 261 (1957). Furthermore, although this court has never considered this question, we do not read the decisions of other circuits as establishing an absolute requirement that fraudulent statements be accompanied by knowledge of the federal involvement to be a matter within the jurisdiction of a federal agency and thus violative of section 1001. The term "jurisdiction" merely incorporates Congress' intent that the statute apply whenever false statements would result in the perversion of the authorized functions of a federal department or agency. *See United States v. Gilliland,* 312 U.S. 86, 93, 61 S.Ct. 518, 85 L.Ed. 598 (1941). Thus, when a statement is not submitted directly to a federal agency, knowledge of federal involvement may be one circumstance to be considered in assessing the potential threat the statement may be to the proper functioning of the federal agen-

cy involved. This knowledge may be decisive when the involvement of the United States in the matter to which the statement relates is peripheral. *Compare Ebeling v. United States, supra, with Lowe v. United States,* 141 F.2d 1005 (5th Cir. 1944). In other instances, a showing that the defendant had actual knowledge of federal involvement might lessen the need for a detailed examination of the federal government's relationship to the statements. *See United States v. Lange,* 528 F.2d 1280, 1287 n.11 (5th Cir. 1976); *United States v. Candella, supra,* at 1226–27.

To hold that this knowledge is always required for the purposes of section 1001 jurisdiction, however, would give the term a narrow and technical meaning not intended by Congress. *See Bryson v. United States,* 396 U.S. 64, 70–71, 90 S.Ct. 355, 24 L.Ed.2d 264 (1969). Here, the Departments of Health, Education, and Welfare and Agriculture administer the food stamp and AFDC programs in accordance with the laws establishing eligibility standards, including controls on receipt of outside income. 42 U.S.C. § 602; 7 U.S.C. § 2013. These laws and the regulations promulgated by the administrative agencies bind the states. 42 U.S.C. §§ 602, 604; 7 U.S.C. § 2014. The federal agencies are entrusted with the responsibility to oversee state administration of these programs to ensure that the enormous amount of federal funds spent for these programs are distributed only to those Congress deems eligible. 42 U.S.C. §§ 602, 604; 7 U.S.C. § 2014. The record below summarizes the auditing and oversight procedures of the Departments of Agriculture and Health, Education, and Welfare designed to enforce federal laws and regulations. We conclude that the statutory scheme demonstrates only that Congress has entrusted to the states the local administration of federal expenditures. The federal agencies retain the ultimate authority to see that the federal funds are properly spent. Certainly the potentially costly fraud involved here results in the perversion of the authorized functions of

fictitious or fraudulent statements or representation, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement

or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

these agencies, whether or not the defendants here were aware of the agency involvement. *Cf. United States v. Feola*, 420 U.S. 671, 676–86, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975) (holding that statute punishing assaults of federal officers does not require knowledge that person assaulted is a federal officer). At trial the prosecution proved that each of the defendants made the statements with fraudulent intent. Our refusal to increase that burden to proof of knowledge of the federal involvement does not unfairly transform innocent conduct into criminal. For these reasons we hold that the statements alleged here pertain to matters within the jurisdiction of a department or agency of the United States.

## IV. Prosecutorial Misconduct

■ The defendants base their final arguments on alleged misconduct on the part of the prosecution throughout the grand jury investigation and their trials. The first argument focuses on allegedly intentional generation by a former United States Attorney of prejudicial pretrial publicity.

The evidence below includes an Information Release from the United States Attorney announcing the indictments and newspaper articles appearing prior to the indictments referring to the first group of offenders to be prosecuted as the most aggravated cases of welfare fraud. The evidence also includes newspaper and national newsmagazine stories reporting the indictments, in which the United States Attorney is quoted as saying, for example, that welfare fraud is the "most serious law enforcement problem" of his career, that "[t]here is an astonishing lack of respect for law from public employees," and that there had been confessions in most cases. This publicity, according to the defendants, violated Department of Justice Regulation 28 C.F.R. § 50.2,[23] Local Criminal Rule No. 1.07 for the Northern District of Illinois,[24] and deprived the defendants of their Fifth and Sixth Amendment rights. As a remedy, the defendants request that their indictments be dismissed. We find, however, that the defendants have failed to show prejudice, and this failure is fatal to their arguments.

**23.** The regulation provides in part:
The release of certain types of information generally tends to create dangers of prejudice without serving a significant law enforcement function. Therefore, personnel of the Department should refrain from making available the following:
(i) Observations about a defendant's character.
(ii) Statements, admissions, confessions, or alibis attributable to a defendant, or the refusal or failure of the accused to make a statement.
(iii) Reference to investigative procedures such as fingerprints, polygraph examinations, ballistic tests, or laboratory tests, or to the refusal by the defendant to submit to such tests or examinations.
(iv) Statements concerning the identity, testimony, or credibility of prospective witnesses.
(v) Statements concerning evidence or argument in the case, whether or not it is anticipated that such evidence or argument will be used at trial.
(vi) Any opinion as to the accused's guilt, or the possibility of a plea of guilty to the offense charged, or the possibility of a plea to a lesser offense.
**24.** Local Rule No. 1.07 provides in part:
(a) It is the duty of the United States Attorney . . . not to release . . . infor-

mation . . . in connection with pending or imminent criminal litigation with which he . . . is associated, if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice.
(b) With respect to a grand jury . . . investigation of any criminal matter, the United States Attorney . . . shall refrain from making any extrajudicial statement which a reasonable person would expect to be disseminated by means of public communication, that goes beyond the public record or that is not necessary to inform the public that the investigation is underway, to describe the general scope of the investigation, to obtain assistance in the apprehension of a suspect, to warn the public of any dangers, or otherwise to aid in the investigation.
(c) From the time of arrest, issuance of an arrest warrant, or the filing of a complaint, information, or indictment in any criminal matter until the commencement of trial or disposition without trial, the United States Attorney . . . shall not release . . . any extrajudicial statement . . . relating to that matter and concerning:
(1) The prior criminal record (including arrests, indictments, or other charges of crime), or the character or reputation of the accused, except that the lawyer . . . may make a factual statement of the accused's name, age,

■■ Misconduct to be prejudicial must do more than exist; it scarcely operates in a vacuum. Thus, it is not surprising that the issue of prejudicial pretrial publicity has been customarily found within the context of a jury trial. The cases cited by the defendants are within that framework. None of the defendants requested a change of venue or a continuance, and, obviously because none requested a jury trial, there was no voir dire of a jury to determine whether the pretrial publicity would have been prejudicial. The motion for a continuance, or for change of venue, or the voir dire process is the traditional method for challenging the claimed adverse publicity. *See United States v. Abbott Laboratories,* 505 F.2d 565, 571 (4th Cir. 1974), *cert. denied,* 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 67 (1975).

■■ We do not accept the speculative argument that the defendants were forced to forego a jury trial because of the publicity. In the first place, there is no basis in this record for the belief that the bench trials in which the defendants participated were other than fair trials. We are not persuaded that the publicity here was so egregious that it would taint a fairly conducted bench trial. Of greater significance, however, is the fact that no effort was made toward securing a jury trial with safeguards that our system of justice provides to ensure a fair jury trial. In one instance the district court denied the motion to dismiss without prejudice, to be reinstated in the event that the defendants, if they chose to elect a jury trial, were unable to obtain a fair and impartial jury. We have no reason to believe that the other district court judges would not have treated the matter similarly if the route chosen had been for a jury trial rather than the sweeping attempt to secure an outright dismissal.

In sum, the assertion on the basis of the publicity here involved that a fair jury trial was unobtainable does not in itself constitute a sufficient showing of prejudice. The assertion remains a bare and speculative allegation. *United States v. Harris,* 542 F.2d 1283, 1294 (7th Cir. 1976), *cert. denied,* 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977); *United States v. Abbott Laboratories, supra,* at 571; *United States v. Caldwell,* 148 U.S.App.D.C. 20, 29, 543 F.2d 1333, 1342 (1974), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976); *Butzman v. United States,* 205 F.2d 343, 349–50 (6th Cir.), *cert. denied,* 346 U.S. 828, 74 S.Ct. 50, 98 L.Ed. 353 (1953). Furthermore, the defendants' allegation that the generation of publicity was intentional misconduct, even if true, does not merit a dismissal of these indictments. The purpose of the Sixth Amendment is to secure a fair trial for the accused. To dismiss the indictments here in the absence of any showing of prejudice would not further this purpose, but rather would constitute a "punishment" of society for misdeeds of a prosecutor." *Cf. United States v. Agurs,* 427 U.S. 97, 110 n.17, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). *See United States v. Serlin,* 538 F.2d 737, 749 (7th Cir. 1976); *United States v. Abbott Laboratories, supra,* at 571.

■ Similarly, although we find that the conduct here may have violated 28 C.F.R. § 50.2 and Local Criminal Rule No. 1.07 for the Northern District of Illinois, we decline to hold that the violation of regulations designed to insure conformity to the Sixth Amendment leads to results that the Amendment itself does not require. *United States v. Lehman,* 468 F.2d 93, 104 (7th Cir.), *cert. denied,* 409 U.S. 967, 93 S.Ct. 273, 34 L.Ed.2d 232 (1972).

■ Finally, we have considered the defendants' extensive list of alleged abuses on

---

residence, occupation, and family status, and if the accused has not been apprehended, the United States Attorney may release any information necessary to aid in his apprehension or to warn the public of any dangers he may present;

(2) The existence or contents of any confession, admission, or statement given by the accused . . .;

\* \* \* \* \* \*

(5) The possibility of a plea of guilty to the offense charged or a lesser offense;

(6) Any opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case.

the part of the prosecutor.[25] The defendants submit this list as grounds for dismissal of their indictments pursuant to our supervisory powers. Except for the violation of 28 C.F.R. § 50.2 and Local Rule 1.07, conduct certainly deserving our censure, we have found no errors committed below. The defendants have shown no prejudice, and no continuing abuse of the criminal processes. The supervisory powers do not give us a "roving commission" to right wrongs committed to criminal defendants, *United States v. Jacobs*, 547 F.2d 772, 777 (2d Cir. 1976), and therefore give us no basis for dismissing the indictments challenged here.

For the above reasons, the convictions of the defendants are affirmed.

Affirmed.

---

25. The alleged misconduct falls into three categories: the grand jury disclosure, the form of the indictments for mail fraud, and the generation of pretrial publicity. We have already discussed all of these allegations of error in detail and see no need to repeat that discussion.