UNITED STATES of America, Appellee,

v.

James A. NOTARANTONIO,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Edward NOTORANTONIO,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

INGE COMPANY INCORPORATED,
Defendant, Appellant.

Nos. 84–1496, 84–1497 and 84–1818.

United States Court of Appeals,
First Circuit.

Argued Nov. 7, 1984.

Decided March 29, 1985.

Oleg Nikolyszyn, Providence, R.I., with whom William A. Dimitri, Jr., Providence, R.I., was on brief for defendant, appellant.

Paul J. Larkin, Jr., Dept. of Justice, Washington, D.C., with whom Lincoln C. Almond, U.S. Atty., Providence, R.I., William C. Bryson, Dept. of Justice, Washington, D.C., and Edwin J. Gale, Sp. Atty. Dept. of Justice, Providence, R.I., were on brief, for appellee.

Before CAMPBELL, Chief Judge, McGOWAN,* Senior Circuit Judge, and BOWNES, Circuit Judge.

McGOWAN, Senior Circuit Judge.

Appellant James Notarantonio was convicted in the District Court of Rhode Island for violating various statutes that prohibit making, or conspiring to make, false statements in connection with programs involving federal funds. Mr. Notarantonio made the statements in connection with his work on a construction project financed with a loan guaranteed by the Small Business Administration. His principal contention upon appeal is that his statements fall outside the ambit of the relevant statutory provisions. He also contends that the evidence is insufficient to support the conspiracy count.

Appellant Edward Notorantonio, James Notarantonio's cousin,[1] was convicted in the same trial on a conspiracy count only. Edward Notorantonio was accused of conspiring with James Notarantonio to make one of the false statements involved here. Edward Notorantonio challenges the sufficiency of the evidence supporting his conviction.

Appellant Inge Company, of which James Notarantonio is owner and president, was convicted in the same trial on a conspiracy count only. It was accused of conspiring with James Notarantonio and with Edward Notorantonio to make one of the false statements. The Inge Company adopts the arguments of James Notarantonio and Edward Notorantonio.

For the reasons stated below, we affirm all the convictions of all defendants.

I

James Notarantonio is the president and sole owner of the Inge Company, which the City of Providence, Rhode Island hired to construct a solid-waste disposal plant. Acting for the Inge Company, Mr. Notarantonio sought a loan of $5,000,000 from the Rhode Island Industrial Facilities Corporation (RIIFC). The federal Small Business Administration (SBA), after examining a number of documents submitted to it by Mr. Notarantonio, agreed to repay the loan to RIIFC if Mr. Notarantonio defaulted.

After obtaining the SBA's guarantee, the RIIFC granted the loan and deposited the loan proceeds with the Industrial National Bank of Rhode Island (the Bank), which acted as trustee of the funds. To draw upon the loan proceeds, the Inge Company,

---

* Of the District of Columbia Circuit, sitting by designation.

1. Although the record is somewhat unclear, it appears that the two cousins spell their last names differently. We shall refer to James Notarantonio by his full name or as "Mr. Notarantonio." We shall always refer to Edward Notorantonio by his full name.

through Mr. Notarantonio, submitted requisitions to the Bank. These requisitions contained certifications by Mr. Notarantonio on behalf of the Inge Company and by the "project supervisor" (an individual employed by an architectural-engineering firm) that the requisitions sought compensation for "proper" expenses of the construction project. The treasurer of the RIIFC then added his signature to the certification form, and the reimbursement was processed by the Bank and paid to the Inge Company. The SBA did not ask to see the requisitions or the certifications until after the loan went into default.

Mr. Notarantonio was indicted on counts involving five sets of alleged transactions, all occurring after the loan and the loan guarantee had been granted. According to the government, Mr. Notarantonio improperly used funds from the loan to pay for an inspection of a turbine generator that had no connection to the construction project for which the loan was granted. The government also alleged that Mr. Notarantonio, using his personal funds, purchased a used garbage shredder in Connecticut for $52,000 and, after a somewhat circuitous series of transactions that involved transfers of ownership to Edward Notorantonio and then the Inge Company, submitted the purchase of the shredder as a project expense of the Inge Company of $175,000. (The transactions involving the shredder are the only transactions at issue in the conspiracy charges.) James Notarantonio also submitted, in separate transactions, the costs of boat covers and of a marine generator purchased for his cabin cruiser, docked in Florida, as expenses of the construction project. The charges for the boat covers were listed as expenses for "truck covers." The charges for the marine generator were accurately described. Finally, the government accused Mr. Notarantonio of submitting a $50,000 check made out to Damiano Brothers Welding, a Rhode Island firm, as evidence of a reimbursable expense when no such payment had ever been made.

The counts involving the turbine inspection and the check made out to Damiano Brothers were dismissed on a Motion for Judgment of Acquittal made at the close of the government's case in chief. Those dismissals are not at issue here.

The jury found Mr. Notarantonio guilty on the counts involving the used shredder and the two purchases of nautical items. For each of these allegedly fraudulent transactions, Mr. Notarantonio had been charged with a violation of 15 U.S.C. § 645(a), which reads in full:

Whoever makes any statement knowing it to be false, or whoever willfully overvalues any security, for the purpose of obtaining for himself or for any applicant any loan, or extension thereof by renewal, deferment of action, or otherwise, or the acceptance, release, or substitution of security therefor, or for the purpose of influencing in any way the action of the [Small Business] Administration, or for the purpose of obtaining money, property, or anything of value, under this chapter, shall be punished by a fine of not more than $5,000 or by imprisonment for not more than two years, or both.

15 U.S.C. § 645(a) (1982). Mr. Notarantonio argues that the statements at issue here were not made to obtain money from, or otherwise influence, the actions of the SBA, and that the counts under this statute must therefore fail.

For each of the transactions involving the shredder and the nautical purchases, Mr. Notarantonio had also been charged with a count under 18 U.S.C. § 1001, which reads in full:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than

$10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1001 (1982). Mr. Notarantonio argues that his statements were neither material nor regarding matters within the jurisdiction of the SBA, and thus that the counts under this statute must fail.

Finally, in connection with the shredder transactions, Mr. Notarantonio, as well as Edward Notorantonio and the Inge Company, were charged with conspiracy under 18 U.S.C. § 371, the relevant paragraph of which reads:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 371 (1982). Mr. Notarantonio argues that, for the reasons described above, his convictions under 15 U.S.C. § 645(a) and 18 U.S.C. § 1001 cannot stand and thus that no underlying offense exists to support a conviction for conspiracy. He also argues that the evidence is insufficient to show his alleged co-conspirator Edward Notorantonio intended to commit any crime, and thus insufficient to convict Edward Notorantonio of conspiracy. He argues further that the asserted insufficiency of the evidence relating to Edward Notorantonio necessitates overturning his own conviction on the conspiracy count because as a matter of law no conspiracy can exist between Mr. Notarantonio and his employer the Inge Company. Edward Notorantonio and the Inge Company make essentially the same arguments against their convictions.

## II.

The first prerequisite for a conviction under section 645(a) is a statement made by the defendant that he knows to be false or a willful overvaluation of a security. *See* 15 U.S.C. § 645(a) (1982). False statements are involved here. The statements chiefly at issue are signed representations on behalf of the Inge Company "that each obligation mentioned herein has been properly incurred and is a proper charge against the ... construction fund." Transcript of Trial, December 12, 1983, at 62. This representation accompanied each of the requisitions here at issue. *See id.* at 63–64 (shredder), 69–70 (marine generator), 70–71 (deck covers). In addition, in one instance the invoice certified by Mr. Notarantonio as representing a proper expense is itself a possible source of a false statement.

The parties do not dispute that a "statement" within the meaning of section 645(a) is involved. *See Owen v. United States*, 386 F.2d 774 (5th Cir.1967) (written representations on application for loan and false invoices); *cf. United States v. Elliott*, 689 F.2d 178 (10th Cir.1982) (per curiam) (submitting third-party check payable to SBA when funds in third party's checking account are insufficient to cover check is not a "statement" for purposes of section 645(a)).

The falsity of the statements is a matter of more contention but little more difficulty. We must uphold the jury's findings if there is substantial evidence, viewed in the light most favorable to the government, to uphold the conviction. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Davis*, 623 F.2d 188, 195 (1st Cir.1980).

■ Mr. Notarantonio argues that the Inge Company did actually pay $175,000 for the shredder even though he purchased it in his personal capacity for $52,000. He asserts that, after spending his own money to buy the shredder for $52,000, he sold the shredder to Edward Notorantonio for $175,000, and that the Inge Company then purchased the shredder from Edward Notorantonio for $175,000. The representation of an expense of $175,000 incurred by the Inge Company, he argues, therefore cannot be false.

There is substantial evidence, however, that this chain of transactions did not actu-

ally result in the proper expenditure of $175,000 by the Inge Company certified by Mr. Notarantonio on the requisition forms. It is undisputed that Edward Notorantonio neither actually paid any money to "buy" the shredder from James Notarantonio nor received any money for "selling" the shredder to the Inge Company. In addition, the government introduced evidence that could reasonably be taken to show that the invoice was back-dated.

From the evidence presented to it, the jury could reasonably conclude that no "sale" for $175,000 in fact occurred, and thus that no expense of $175,000 was incurred by the Inge Company. The jury could reasonably infer that the two purported "sales" were designed simply to allow Mr. Notarantonio to submit an invoice purporting to show an expense of $175,000 by the Inge Company for the used shredder without having to reveal that he paid only $52,000 for the shredder. Edward Notorantonio's participation as middleman and Mr. Notarantonio's switch in roles from independent speculator in used shredders to president of the Inge Company could reasonably be seen as necessary steps in this scheme. In that case, Mr. Notarantonio represented that there was an expense of $175,000 when no sale for such a price ever occurred. The certification would under this theory be false because no "expense" for $175,000 had been incurred.

The government argued that the invoice for $175,000 for a used shredder involved a shredder for which Mr. Notarantonio had originally paid only $52,000. Evidence that would allow the jury to estimate the true worth of the shredder was contradictory; the jury could reasonably have concluded that the shredder was worth $52,000, or even less. A reasonable jury could, on the evidence presented to it, have concluded beyond a reasonable doubt that a charge to the project of almost three-and-a-half times the original purchase price of the shredder did not represent a proper expense. While the president of the Inge Company might plausibly have paid an independent purchaser of garbage shredders some compensation above the latter's outlay of $52,000

expenditure for the salesman's time and effort in locating the shredder, a jury could reasonably conclude that a "commission" of $123,000 is not a proper expense on a $52,000 item. This conclusion is especially plausible given that the "salesman" set his own "commission" in his role as president of the Inge Company. The certification would under this theory be false because the expense incurred was not "proper."

■ The government also argued at trial that some of the invoices submitted in connection with loan requisitions were for the purchase of a canvas deck cover and a marine generator for Mr. Notarantonio's boat in Florida. A jury could, on the evidence presented to it, reasonably have concluded that Mr. Notarantonio made such purchases. It could have gone on to conclude beyond a reasonable doubt that expenses for a boat cover and a marine generator were not properly chargeable to a construction project involving a waste-treatment plant on dry land.

Mr. Notarantonio argued that the nautical expenses were proper because he used the boat as an office. The jury, however, could reasonably have disbelieved this assertion, especially because the meetings on the boat that Mr. Notarantonio claimed to have justified the expenses as proper did not occur until several years after the statements at issue here.

In addition to the falseness of the certification that the invoice represented proper expenses, the invoices submitted by Mr. Notarantonio falsely described the deck covering as "truck covers." In this instance, the invoice itself was a false statement.

Having established that in each transaction at issue Mr. Notarantonio made a false statement within the meaning of section 645(a), we must now determine whether the jury could have properly concluded that Mr. Notarantonio's purpose in submitting the statements was one of the purposes listed in section 645(a).

■ Section 645(a) lists three purposes that, when combined with a false statement, result in a violation of the statute: obtaining a loan, or extension thereof by renewal or deferment of action; influencing in any way the action of the SBA; and obtaining money, or anything of value, under the Small Business Act.[2] In each case, the description of the listed aim is preceded by the phrase "for the purpose of."

The natural reading of the portion of the statute describing prohibited purposes is that the three purposes listed are alternative conditions, each independently sufficient to violate the statute when combined with a false statement made with knowledge of that falsity. *See Garcia v. United States,* —— U.S. ——, ——, 105 S.Ct. 479, 482, 83 L.Ed.2d 472 (1984) (interpreting use of "or" in statute governing robberies of mail or money from United States). Their connection with the word "or" indicates the disjunctive nature of the listing. The repetition of the phrase "for the purpose of" in the latter portion of the subsection indicates that any one or more of those purposes must be combined with a statement made with knowledge of its falseness to establish a violation of the statute.

We do not believe that *United States v. Carter,* 526 F.2d 1276 (5th Cir.1976), is to the contrary. In that case, the Fifth Circuit ruled that Congress's passage of 15 U.S.C. § 645(a) did not impliedly repeal 18 U.S.C. § 1001. The parties here do not raise the issue of implied repeal. Mr. Notarantonio nonetheless asserts that the Court's phrasing in *Carter* requires the government to show in every case that the false statement was made for the purpose of influencing the SBA. Brief of Appellant James Notarantonio at 12–13. Since those

portions of the indictment that charge Mr. Notarantonio with violating section 645(a) mention only that the false statements were made for the purposes of obtaining money under the Small Business Act, the indictment would, at least according to Mr. Notarantonio, be legally insufficient to support a conviction. *See generally United States v. Sedlak,* 720 F.2d 715, 719 (1st Cir.1983) (discussing "well-settled" standards for determining sufficiency of indictment), *cert. denied,* —— U.S. ——, 104 S.Ct. 1312, 79 L.Ed.2d 709 (1984). We need not reach the validity of the later links in Mr. Notarantonio's chain of reasoning, however, because we believe Mr. Notarantonio misinterprets *United States v. Carter.*

In discussing the rationale behind its holding, the Fifth Circuit briefly compared the two statutes:

The offenses defined in the statutes are not identical, and involve different elements. § 1001 requires a showing of materiality of the statement made. § 645(a) requires that the false statement be made for the purpose of influencing the action of the S.B.A., and does not require the government to show that the particular statement would have, in fact, affected the action of the S.B.A.

526 F.2d at 1278. We do not believe that the Fifth Circuit meant by this language to prohibit the government in all cases from using the other illegal purposes set forth in section 645(a) to obtain a conviction. That court, we believe, would not have rendered superfluous the other "for the purpose of" clauses without a more extensive analysis.

A far more likely explanation for the Fifth Circuit's phrasing is that it was limiting its attention to those portions of the two statutory provisions that most nearly

**2.** Section 645(a) refers to efforts to obtain money "under this chapter." Section 645(a) is part of chapter 14A of Title 15 of the *United States Code.* The provision under which the SBA granted the guarantee at issue here, 15 U.S.C. § 694–1 (1982), is part of chapter 14B, not chapter 14A. Congress has expressly stated in chapter 14B, however, that the SBA can use § 645(a) in connection with exercises of its authority under chapter 14B. 15 U.S.C. § 687(f) (1982).

Chapter 14A was originally the codification of the Small Business Act of 1953, Pub.L. No. 163, tit. II, 67 Stat. 232. Chapter 14B was originally the codification of the Small Business Investment Act of 1958, Pub.L. No. 85–699, 72 Stat. 689. Section 694–1 was passed in 1976. Act of June 4, 1976, Pub.L. No. 94–305, tit. I, 90 Stat. 663. For simplicity's sake, we simply refer to the necessity for the money to have been obtained "under the Small Business Act" or "under the Act."

overlapped. The purposes of obtaining a loan or of obtaining anything of value under the Act mentioned in section 645(a) have not even a distant analog in section 1001. The purpose of influencing the SBA listed in section 645(a), however, bears some relation to the requirement under section 1001 that the false statement have a natural tendency to influence the agency to which the statement is made. *See infra* pp. 785–786 (discussing materiality requirement of section 1001). Since the Fifth Circuit found that even the existence of these most nearly overlapping provisions was insufficient to imply a repeal of section 1001, there was no need for the court to go on to discuss less similar provisions.

■ Having found that making a false statement for the purpose of obtaining money under the Small Business Act is by itself sufficient to allow conviction under section 645(a), we must determine if Mr. Notarantonio attempted to obtain money under the Act, as the indictment charged. Although the link between his obtaining the money through his false statements and the powers granted to the SBA under the act is more attenuated here than in the typical case, we hold that the convictions under section 645(a) may stand.

The typical case under section 645(a) involves an application for, or disbursements from, a loan provided directly by the SBA. *See, e.g., United States v. Cooper,* 493 F.2d 473 (5th Cir.), *cert. denied,* 419 U.S. 859, 95 S.Ct. 108, 42 L.Ed.2d 93 (1974); *Owen v. United States, supra.* Such cases clearly involve money obtained "under the Act." Without the authority granted to the SBA under the Act, no loan application process, and no monies in granted loans, would exist. In addition, the money at issue in these cases belonged initially to the SBA.

In this case, we are presented with disbursements from a loan not provided directly by the SBA. The loan proceeds were rather provided by the RIIFC under its own statutory authority, with the SBA serving only as the guarantor of the loan. Viewed as a matter of ownership of the funds, the monies were not "obtained" from the SBA. Indeed, Mr. Notarantonio, the maker of the false statements, could not have obtained money from the SBA even if the SBA were called upon to honor its guarantee. In the event of default by Mr. Notarantonio, the SBA was obligated to pay the RIIFC the guarantee money, not Mr. Notarantonio. It is clear, therefore, that the money at issue here was not obtained directly from the SBA.

We nonetheless affirm the convictions under section 645(a). We do so because the statute prohibits the use of false statements to obtain money "under the Act" rather than "from the Small Business Administration." Using the authority granted to it under the Act in 15 U.S.C. § 694–1, the SBA agreed to guarantee the proposed loan. That guarantee having been granted, the RIIFC agreed to make the proposed loan a reality. Without the SBA's authority under the Act to guarantee loans, the particular loan at issue here would not have existed, and Mr. Notarantonio would not have had the opportunity to obtain the monies of this particular loan. Because Mr. Notarantonio obtained his money from a loan guaranteed by the SBA using its authority as granted it under the Act, we hold that he obtained money "under the Act" even though that money was not obtained directly from the SBA.

We believe that our interpretation is consistent with congressional intent. Although it is unclear whether Congress contemplated the SBA's issuance of loan guarantees rather than loans when it enacted section 645(a);[3] Congress's choice of multiple, alternative illegal purposes in section 645(a) indicates a desire to make illegal a broad range of conduct. Congress could easily have limited the reach of the statute.

---

**3.** Section 645(a) was included, in its present form, in the 1953 statute that created the SBA. Small Business Act of 1953, tit. II, 67 Stat. 237. Congress did not give the authority any guarantee authority until 1965, when it gave the SBA the authority to guarantee the leases of commercial and industrial property entered into by small business. *See* Housing and Urban Development Act of 1965, Pub.L. 89–117, tit. III, § 316(a), 79 Stat. 451, 482.

to loans directly issued to the SBA by saying so directly, but it did not. *See United States v. Yermian*, — U.S. —, —, 104 S.Ct. 2936, 2942, 82 L.Ed.2d 53 (1984) (Congress could have narrowed reach of section 1001 but did not). And although the specific legislative history of 15 U.S.C. § 645(a) is scanty, it is only natural to infer that Congress intended such a broadly worded section to be a general tool for the SBA to use in preserving the integrity of whatever programs it might undertake under the substantive provisions of the Act. *See also infra* p. 787 (need for agencies to have legal remedies available to preserve administrative integrity of their programs).

### III

The second statutory provision at issue in this case is the general false statements statute, 18 U.S.C. § 1001. The courts, tracking the statutory language, have delineated five prerequisites to a violation of section 1001: (1) a statement that was (2) false, (3) material, (4) made knowingly and willfully, and (5) made in a matter within the jurisdiction of a federal agency. *See, e.g., United States v. Petullo*, 709 F.2d 1178, 1180 (7th Cir.1983); *United States v. Baker*, 626 F.2d 512, 514 (5th Cir.1980).

■ The invoices and certifications that Mr. Notarantonio submitted to the Bank were clearly "statements" within the meaning of section 1001. Courts have on numerous occasions upheld convictions under section 1001 when the accused simply answered factual questions put to him. *See United States v. Stanford*, 589 F.2d 285 (7th Cir.1978) (questions on sources of income on welfare-benefits application), *cert. denied*, 440 U.S. 983, 99 S.Ct. 1794, 60 L.Ed.2d 244 (1979); *United States v. Carter, supra* (questions on previous criminal convictions on application for SBA bonding program); *Blake v. United States*, 323 F.2d 245 (8th Cir.1963) (questions on previous criminal convictions on job application).

Here, the cover letter submitted with the invoices explicitly requested Mr. Notarantonio to represent the accuracy and propriety of the attached expenditures. One could hardly imagine a clearer example of a "statement" under Section 1001 than the combination of the cover letters and invoices involved here.

■ The jury could quite reasonably have concluded that the statements were false. *See supra* pp. 781–783. From the same evidence, and from disbelieving Mr. Notarantonio's frequent protestations of innocence, the jury could also reasonably have concluded that Mr. Notarantonio made the false statements knowingly and willfully.[4]

The most difficult issues of this case involve the third and fifth prerequisites, materiality and the jurisdiction of the agency involved. These two issues are not entirely unrelated. *See United States v. Di Fonzo*, 603 F.2d 1260, 1266 (7th Cir.1979) (requirements of materiality and agency jurisdiction are "logically related"), *cert. denied*, 444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 488 (1980); *cf. United States v. Wolf*, 645 F.2d 23, 25 (10th Cir.1981) (issues of materiality and agency jurisdiction may be "intermixed"). Nonetheless, we treat each separately.

■ In determining materiality, the standard is generally phrased as "whether the statement had a natural tendency to influence, or was capable of influencing, the decision of a government agency in making a determination required to be made." *United States v. Brack*, 747 F.2d 1142, 1150 (7th Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 1193, 84 L.Ed.2d 339 (1985); *see United States v. Baker*, 626 F.2d at 515; *Blake v. United States*, 323 F.2d at 246; *Freidus v. United States*, 223 F.2d 598, 601 (D.C.Cir.1955). The government need not show that the agency was actually influenced by the statements involved. *See United States v. Brack*, 747

---

**4.** The evaluation is with respect to the defendant's knowledge of the falsity of the statements rather than with respect to the defendant's knowledge of the statement's materiality to the federal agency involved. *See United States v. Yermian*, — U.S. —, 104 S.Ct. 2936, 82 L.Ed.2d 53 (1984).

F.2d at 1150; *Blake v. United States*, 323 F.2d at 247.

■ Mr. Notarantonio argues that his statements were incapable of influencing the government. *Cf. United States v. Radetsky*, 535 F.2d 556, 571–74 (10th Cir.) (when physician submitted allegedly false Medicare claims for drugs not reimbursable in any case under the program, misstatements could not be material), *cert. denied*, 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976). His argument runs essentially as follows. The federal government was a guarantor of the loan, not the maker of the loan. The federal government agreed to guarantee the loan before the false statements at issue here were made. The false statements leading to disbursements of the loan's proceeds, since they followed the decision to guarantee the loan, could not have influenced that decision.

Mr. Notarantonio's argument, however, is incomplete. He is correct to say that his false statements could not have influenced the SBA's decision to guarantee the loan. The government's decision to guarantee the loan, however, was not the final determination that the SBA made in its relationship with Mr. Notarantonio. The SBA went to some lengths to safeguard its guarantee funds against payouts caused by a recipient of a guaranteed loan who defrauds the lender. Here, those safeguards were extensive enough to make material the fraudulent statements made in connection with a guaranteed loan, even though the guarantee itself had already been granted.

The structure of the contractual relationships among Mr. Notarantonio, the Bank, the RIIFC, and the SBA allowed the SBA to determine that Mr. Notarantonio was in default if he requested payment for items not proper expenses of the project. If Mr. Notarantonio's false statements had not prevented the SBA from discovering the default, the SBA could have reduced its exposure under the guarantee by stopping further payouts under the loan and seeking to recover some of the loan's proceeds from the borrower. Mr. Notarantonio's false

statements therefore had the natural tendency to influence the SBA, in that in the absence of the statements, the SBA would have been likely to exercise its rights to reduce its exposure under its loan guarantee.

The loan agreement between the RIIFC and Mr. Notarantonio's Inge Company, introduced in evidence as Government Exhibit No. 2, defined costs of the project as costs "incurred for labor and materials ... in connection with the acquisition, construction or installation of the project," costs of "engineering services ... required by or consequent upon the proper construction of the project," and a variety of finance costs. Gov't Exhibit No. 2 at 4–5, § 1. The agreement authorized the Bank to reimburse Mr. Notarantonio for such costs if he certified that the submitted expenses were "properly incurred and ... a proper charge" against the loan fund. *Id.* at 14–15, § 9(b).

Explicitly listed among the "Events of Default" is "[t]he making of any representation or warranty by the [Inge] Company in this Agreement or in any document executed in connection with this Agreement which is false or misleading in any material respect." *Id.* at 26, § 16(c). In addition, a "[f]ailure by the [Inge] Company to observe or perform any covenant, condition or agreement in this [Loan] Agreement" is also an "Event of Default." *Id.* at 25, § 16(b). When default occurs, the RIIFC may take a wide variety of steps to reduce the likelihood that the loan will not be paid in full, *id.* at 28–33, § 17, including the cessation of disbursement to the Inge Company of proceeds from the loan, *id.* at 32, § 17(a)(6), and the foreclosure sale of the Inge Company's property, *id.* at 29–30, § 17(a)(3).

The trust agreement between RIIFC and the Bank, introduced in evidence as Government's Exhibit No. 3, provided that the Bank could sue on behalf of the SBA in case of default. Gov't Exhibit No. 3 at 58, § 7.02. The Bank is also required by the trust agreement to notify the SBA of any event of default and to minimize losses from the loan proceeds at the direction of

the SBA. *Id.* at 62–63, § 7.11(a), (b). Indeed, the SBA can, in the case of default, obtain possession of the entire project. *Id.* at 63, § 7.11(d).

It is clear, therefore, that Mr. Notarantonio's false statements had the natural tendency to influence the SBA's behavior. If he had not submitted the false certifications that the expenses for which he sought reimbursement were properly chargeable, he would have been in default under section 16(b) of the loan agreement for breaking his agreement to submit a certification with each submission of expenses. The Bank would have been obliged to notify the SBA, and the SBA would obviously then be likely to act so as to reduce its exposure as guarantor through the variety of means at its disposal. The fact that Mr. Notarantonio falsely certified the invoices as proper expenses therefore had the natural tendency to influence the SBA to refrain from determining that the loan was in default.

In addition to influencing the SBA to refrain from exercising its rights to minimize the magnitude of the guarantee paid out, Mr. Notarantonio's statements led the SBA to refrain from exercising its general power under 13 C.F.R. § 115.14(b) (1984) to investigate whether Mr. Notarantonio had violated the SBA statute. Mr. Notarantonio's false statements also had the natural tendency to influence the SBA not to inspect the project site, Gov't Exhibit No. 2 at 37, § 28, in what presumably would have been an effort to prevent improper expenditures. Both these grounds contribute to the materiality of the false statements made. *See United States v. Brack,* 747 F.2d at 1150.

■ The statements at issue here also meet the requirement that they be "within the jurisdiction" of the SBA. This requirement is to be interpreted broadly. *See United States v. Rodgers,* — U.S. —, — – —, 104 S.Ct. 1942, 1946–47, 80 L.Ed.2d 492 (1984). There is widespread agreement that it is no obstacle to establishing agency jurisdiction under section 1001 that the statements were not initially made to the federal government. *See*

*United States v. Stanford,* 589 F.2d at 297; *United States v. Matanky,* 482 F.2d 1319, 1322 (9th Cir.), *cert. denied,* 414 U.S. 1039, 94 S.Ct. 539, 38 L.Ed.2d 329 (1973); *United States v. Waters,* 457 F.2d 805 (3d Cir. 1972); *Ebeling v. United States,* 248 F.2d 429, 433–36 (8th Cir.), *cert. denied,* 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 261 (1957). Indeed, statements need not have been conveyed to the federal government at all to sustain a conviction. *See United States v. Petullo,* 709 F.2d at 1180–81.

For liability under section 1001 to attach, it is necessary only that the "false statements ... result in the perversion of the authorized functions of a federal department or agency." *United States v. Stanford,* 589 F.2d at 297 (citing *United States v. Gilliland,* 312 U.S. 86, 93, 61 S.Ct. 518, 522, 85 L.Ed. 598 (1941)). In *Stanford,* the federal government had the definite responsibility to reimburse the entity to whom the representations were made. Here, the government's responsibility for reimbursement was initially a contingent one. If Mr. Notarantonio had never defaulted on the loan, the government would not have incurred that responsibility. But Mr. Notarantonio did default, and the government did become responsible for reimbursing the Bank for the monies taken out under the loan.

■ The government can protect the administrative integrity of its programs by obtaining convictions under section 1001 even when the government has lost no money because of the false statements. *See United States v. Gilliland,* 312 U.S. 86, 91–94, 61 S.Ct. 518, 521–522, 85 L.Ed. 598 (1941); *United States v. Wolf,* 645 F.2d 23, 25 (10th Cir.1981). And here, the SBA *did* in fact wind up paying out money, though not to the appellant.

■ We hold, therefore, that the contingent responsibility generated by a loan guarantee is sufficient to bring the matter within the jurisdiction of the SBA, given that the provisions of the loan and trust agreements gave the SBA protection if it discovered the falsity of the statements

and that the SBA did in fact have to make good on its guarantee. *Cf. United States v. Mellon,* 96 F.2d 462 (2d Cir.) (false statements made in application to bank for loan insured by federal government), *cert. denied,* 304 U.S. 586, 58 S.Ct. 1061, 82 L.Ed. 1547 (1938).

## IV

We treat finally the convictions of the appellants under 18 U.S.C. § 371 for conspiring to commit an offense against the United States.

James Notarantonio purchased a used shredder from the City of Milford, Connecticut, for $52,000. Edward Notorantonio's construction firm transported the shredder to Rhode Island, the site of the project. An invoice of Edward Notorantonio's company with approximately the same date as the shipment shows his "purchase" of the shredder for $175,000. James Notarantonio's company then "repurchased" the shredder for $175,000 from Edward Notorantonio's company, although the latter never actually received any money for the "sale." James Notarantonio submitted a requisition listing $175,000 as an expense for the shredder to the Bank. From this evidence, the government asserted the two men conspired to make false statements under sections 645 and 1001.

The two men allege that there was insufficient evidence to convict them. They argue more particularly that there is no evidence to show that Edward Notorantonio intended to defraud the government, and thus that the conspiracy must fail because only one "conspirator" was conscious of the conspiracy.[5]

 The first issue we must face regarding the conspiracy count involves the motions made for acquittal on that count at the close of the government's evidence and again at the close of the defendants' evidence. Because the motion for acquittal made at the close of plaintiff's evidence was followed by evidence from the defendant, this court considers the mid-trial motion waived. *See United States v. Greenleaf,* 692 F.2d 182, 185 (1st Cir.1982), *cert. denied,* 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983). *See generally* C. Wright, Federal Practice and Procedure § 463 (1982) (discussing views of various courts). The law of this circuit therefore requires us to examine all the evidence from the trial. *See Colella v. United States,* 360 F.2d 792, 802 (1st Cir.), *cert. denied,* 385 U.S. 829, 87 S.Ct. 65, 17 L.Ed.2d 65 (1966).

We hold that, taking into account all the evidence presented at trial, the government bore its burden of proof on the conspiracy count. The government presented substantial evidence from which a jury could infer beyond a reasonable doubt that Edward Notorantonio had reached an agreement with his cousin James Notarantonio to commit an offense against the United States, and that one of them committed an overt act in furtherance of this object. *See United States v. Falcone,* 311 U.S. 205, 210, 61 S.Ct. 204, 206, 85 L.Ed. 128 (elements of conspiracy); *United States v. Davis,* 623 F.2d 188, 195 (1st Cir.1980) (standard of review).

There is little question that the evidence presented at trial, viewed in the light most favorable to the government, shows that the two men took concrete steps that could be viewed as in furtherance of a conspiracy to commit the offense against the United States of making false statements. James Notarantonio admits that he purchased the shredder, and that he submitted the invoice claiming $175,000 as a proper expense. Edward Notorantonio concedes that he transported the shredder from the point of purchase to the project site; without the shredder's eventual presence on the site, any claim that its purchase was a proper

---

5. The government also indicted the Inge Company as a conspirator. The Inge Company is wholly owned by James Notarantonio, its president. Because we hold that the jury could reasonably have found that Edward Notorantonio knowingly conspired with James Notarantonio, we need not discuss the role of the Inge Company to affirm the conspiracy convictions of the two men. We discuss the count against the Inge Company separately. *See infra* pp. 789–790.

expense of the project would be transparently false.

The more substantial question is whether a jury could reasonably conclude that an agreement existed between Edward Notorantonio and James Notarantonio to commit an offense against the United States. We hold that the jury could reasonably draw such an inference from the evidence before it.

 There is little direct evidence that Edward knew the valuation of the shredder was exaggerated or knew that James was otherwise engaged in defrauding the government. Circumstantial evidence, however, can be sufficient to support a conviction for conspiracy. *See, e.g., United States v. Marsh,* 747 F.2d 14 (1st Cir.1984); *United States v. DeLutis,* 722 F.2d 902, 905 (1st Cir.1983). As this court has said in another case involving a conspiracy under 18 U.S.C. § 371 and violations of section 1001, "[p]articipation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and a collocation of circumstances.'" *United States v. Cincotta,* 689 F.2d 238, 241 (1st Cir.) (quoting *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942) (citations omitted)), *cert. denied,* 459 U.S. 991, 103 S.Ct. 347, 74 L.Ed.2d 387 (1982); *accord United States v. Peters,* 732 F.2d 1004, 1007 (1st Cir.1984) (case involving mail fraud and section 371).

 Here, the two men worked closely together on the construction project. *Cf. United States v. Francomano,* 554 F.2d 483, 487 (1st Cir.1977) (intimacy of association on small boat can be one factor in circumstantial showing of guilt). They used the same office and the same secretary. Edward Notorantonio obtained possession of the used shredder without paying for it, and he allowed the Inge Company to take possession of the shredder without accepting any money in return. There was evidence that the invoice signed by Edward was back-dated, a practice that the jury could reasonably infer indicated efforts to conceal the conspiracy or to disguise the acts that furthered its objective. *Cf. United States v. Loew,* 145 F.2d 332 (2d Cir.1944) (upholding conviction of conspirators who made no record of sales of sugar despite federal government's requiring them to do so), *cert. denied,* 324 U.S. 840, 65 S.Ct. 587, 89 L.Ed. 1403 (1945). *But cf. Bacon v. United States,* 127 F.2d 985 (10th Cir.1942) (overturning conviction of conspirators who did not keep proper records). The jury could reasonably have disbelieved defendants' testimony that they undertook the transactions involving the used shredder to prevent difficulties with labor unions or the Interstate Commerce Commission, and instead accepted the government's theory that the transfers of possession were to facilitate the submission of the invoice for the $175,000 "purchase" of the shredder. Taking all this evidence in the light most favorable to the government, a jury could infer that Edward Notorantonio reached an agreement with James Notarantonio to participate in a scheme involving the submission of false documents on a matter within the jurisdiction of a federal agency.

 A set of reasonable jurors could also have found that the Inge Company was a party to the agreement to submit false statements. Through its president Mr. Notarantonio, the Inge Company must have been aware of the goings-on relating to the shredder. In addition, the Inge Company's participation in the scheme was both prominent and crucial, as it was the entity in the name of which the requisitions at issue here were submitted. And because Edward Notorantonio was not an employee of the Inge Company, the plurality of actors necessary to establish a conspiracy is present despite the fact that James Notarantonio and the Inge Company could not by themselves constitute a conspiracy. *See Poller v. CBS,* 368 U.S. 464, 469, 82 S.Ct. 486, 489, 7 L.Ed.2d 458 (1962) (corporation and its officers may properly be indicted for conspiracy when participation of independent parties in conspiracy is also alleged); *cf. Walker v. Providence Journal Co.,* 493 F.2d 82, 87 (1st Cir.1974)

(corporation cannot conspire with its own employees).

*Affirmed.*