UNITED STATES of America, Appellee,

v.

Guillermo A. ALEMANY RIVERA,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Edgar M. STELLA PEREZ,
Defendant, Appellant.

Nos. 83–1713, 83–1733.

United States Court of Appeals,
First Circuit.

Heard Sept. 13, 1985.
Decided Dec. 26, 1985.

Pedro J. Varela, Hato Rey, P.R., for defendant, appellant Guillermo A. Alemany Rivera.

Harvey B. Nachman, Santurce, P.R., with whom Eduardo Morales-Coll, Hato Rey, P.R., was on brief, for defendant, appellant Edgar M. Stella Perez.

John C. Carver, Trial Atty., Fraud Section, Criminal Div., U.S. Dept. of Justice, with whom Daniel F. Lopez-Romo, U.S. Atty., Hato Rey, P.R., was on brief, for appellee.

Before CAMPBELL, Chief Judge, ALDRICH and TORRUELLA, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

Defendants-appellants Dr. Edgar M. Stella-Perez and Guillermo A. Alemany-Rivera appeal from their convictions in the United States District Court for the District of Puerto Rico. We affirm.

## I.

On July 7, 1982, defendants-appellants Stella and Alemany were jointly charged in a nine-count indictment. Count one charged Stella, the President, Chairman of the Board of Directors, and former Medical Director of the Hospital Nuestra Senora de la Guadalupe in Hato Rey, Puerto Rico (the "Hospital"), and Alemany, the former controller of the Hospital, with conspiracy to defraud the Departments of Housing and Urban Development ("HUD") and Health and Human Services ("HHS") in connection with a federally insured $12.46 million mortgage loan obtained by the Hospital for remodeling and expansion. Count one alleged that Stella and an unindicted co-conspirator named Jose A. Cardona-Alvarez, the Hospital's former assistant administrator, controlled a furniture company known as Casa Cardona, Inc., and its subsidiary, an equipment company by the name of AAA Hospital Supply, Inc. Stella and Cardona allegedly used these two corporations, with Alemany's assistance, to siphon off the Hospital's mortgage funds by selling equipment and furnishings to the Hospital at inflated prices, and by charging the Hospital for equipment that the corporations never furnished.

Counts two through four of the indictment charged Stella and Alemany with submitting and causing to be submitted false documents to HUD to procure mortgage funds. Counts five through seven charged the defendants with submitting and causing to be submitted false Medicare cost reports for the years 1977, 1978, and 1979. Counts eight and nine charged Stella and Alemany with making, aiding, and abetting false oaths in bankruptcy in connection with personal bankruptcy petitions filed by Stella and his wife in 1979.

After a 30–day jury trial, Stella was found guilty on all counts, sentenced to a 20–year term of imprisonment, and placed on probation for another five years on condition that he make restitution of $686,349. Alemany was found guilty on counts one, five, and six of the indictment, sentenced to ten years in prison, and fined $10,000. This appeal followed.

## II.

Stella and Alemany[1] were charged under counts five, six, and seven with submitting and causing to be submitted false Medicare cost reports on the Hospital's behalf for the years 1977, 1978, and 1979, in violation of 18 U.S.C. §§ 1001 & 2 (1982).[2] It was alleged in these counts, *inter alia*, that the cost reports falsely represented to HHS's fiscal intermediaries, Blue Cross of Florida and Cooperativa de Seguros de Vida de Puerto Rico, that none of the costs for

---

1. Stella was convicted on all three of these counts. Alemany was convicted only on counts five and six.

2. Sections 1001 and 2 provide:
 § 1001. *Statements or entries generally*
 Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.
 § 2. *Principals*
 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
 (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

which the Hospital sought reimbursement "resulted from transactions with related organizations as defined in the Provider Reimbursement Manual, Part I, Chapter 10," when in fact a number of expenses included in the cost reports arose out of transactions with AAA Hospital Supply.

The significance of whether the Hospital had transacted business with a related organization was that equipment acquired from such a source could only be reimbursed "at the cost to the related organization." 1 Medicare & Medicaid Guide (CCH) ¶ 5,679, at 1181 (1983). The Provider Reimbursement Manual contained the following definitions pertaining to related organizations:

> *Definitions.*—The term "related to the provider" means that the provider to a significant extent is associated or affiliated with, or has control of, or is controlled by, the organization furnishing the services, facilities, or supplies to the provider.... Common ownership arises when an individual, or individuals, holds significant ownership or equity in both the provider and the organization serving the provider.... The term "control" means that an individual or an organization has the power to influence or direct the actions or policies of both a provider and a related organization to a significant extent....

*Id.,* ¶ 5,677, at 1879-3. These definitions substantially track the definitions of "related to the provider," "common ownership,"

and "control" contained in 42 C.F.R. § 405.-427(b) (1984). At trial, the government introduced testimony explaining what related organizations were within the meaning of the Medicare Regulations.[3]

Stella and Alemany argue that counts five, six, and seven of the indictment should have been dismissed, because there was never any finding by HHS or its intermediaries, Blue Cross of Florida and Cooperativa de Seguros de Vida de Puerto Rico, that AAA Hospital Supply was "related to" the Hospital as that term is defined in the Medicare Regulations and the Provider Reimbursement Manual.[4] Both defendants contend that, because the Medicare Regulations provide that, in the event of question, a determination of whether a provider has acquired supplies or services from a related organization is to be made in the first instance by an intermediary, and the provider then has a right of appeal to a Provider Reimbursement Review Board, *see* 42 C.F.R. §§ 405.1801–07, 405.-1835 (1984), the district court was without jurisdiction to decide whether, contrary to the representations in the cost reports, the Hospital was "related to" AAA Hospital Supply.

██ We disagree. The district court's jurisdiction over counts five, six, and seven was predicated on allegations that the defendants had violated a criminal statute, 18 U.S.C. § 1001. *See* 18 U.S.C. § 3231 (1982). Patently, the district court's as-

---

**3.** For example, Mr. David Ramos-Usero, a former senior auditor in the San Juan Office of Blue Cross of Florida, testified on direct:

Q: What is a related organization in Medicare terms?

A: In Medicare terms, a related organization refers [to] when two or more parties with common ownership or control have business transactions.

Q: All right, and why [does] Medicare[ ] care about that?

A: Medicare would pay the cost only of the related party which would be the company making business with the hospital or the health institution, they would recognize only the cost and would not recognize any profit margin in those business transactions.

Q: And why is that?

A: Because [the] Medicare Program only accepts cost as a cost on the care of the Medicare beneficiaries.

Q: Is there a particular disclosure requirement on the cost report, for related organizations?

A: Yes, there is a work sheet on the cost report ... which relate[s] to related organizations.

**4.** Stella raised this issue below, but Alemany moved only to preclude the admissibility of the Provider Reimbursement Manual in evidence. To the extent that Alemany's argument involves an attack upon the subject matter jurisdiction of the district court, Alemany's failure to raise the issue below does not preclude his raising it on appeal. Fed.R.Crim.P. 12(b)(2); *Pon v. United States,* 168 F.2d 373 (1st Cir.1948).

sumption of criminal jurisdiction over these counts did not usurp HHS's primary, civil jurisdiction over any claims made by the Hospital for reimbursement. *Compare, e.g., Kechijian v. Califano,* 621 F.2d 1 (1st Cir.1980) (sustaining district court's refusal to exercise jurisdiction over physician's claims for reimbursement under the Medicare Act where physician had failed to first avail himself of administrative remedies).

Whether or not it was clear that AAA Hospital Supply was related to the Hospital would, of course, bear on whether or not the defendants had the requisite criminal intent. If the relationship was sufficiently questionable, the defendants could not be held criminally accountable for denying its existence. But there was overwhelming evidence in this case that the Hospital was "related to" AAA Hospital Supply within the meaning of the Medicare Regulations and the Provider Reimbursement Manual. For example, testimonial and documentary evidence introduced at trial tended to show that (1) Stella was the corporate president of both the Hospital and AAA; (2) Jose Cardona, the Hospital's assistant administrator with responsibility for equipment purchases, was also the sole employee of AAA; and (3) AAA had no stock and no capitalization, and its only source of income was the Hospital's mortgage fund. *See Burnham v. United States,* 297 F.2d 523, 524–25 (1st Cir.1961); *cf. Nader v. Allegheny Airlines, Inc.,* 426 U.S. 290, 305–06, 96 S.Ct. 1978, 1987–88, 48 L.Ed.2d 643 (1976) ("The standards to be applied in an action for fraudulent misrepresentation are well within the conventional competence of the courts, and the judgment of a technically expert body is not likely to be helpful in the application of these standards....").

Alemany contends that the district court's assumption of jurisdiction over these counts prevented him from showing that Casa Cardona, AAA Hospital Supply, and the Hospital fell within the exception to the rules governing related organizations. *See* 42 C.F.R. § 405.427(d) (1984).[5] Nothing would have prevented Alemany, however, from presenting this issue to the district court. There is no indication he did so. There is, moreover, little if anything to indicate that the exception was applicable. We find no error on this score.

Alemany asserts that our ruling will open a veritable Pandora's box, and result in criminal fraud prosecutions whenever an intermediary determines that a provider has sought reimbursement for supplies or services provided by a related organization. But as we have indicated, a good-faith claim for reimbursement, made without intent to defraud the government, would not support a conviction under 18 U.S.C. § 1001. *See, e.g., United States v. Weatherspoon,* 581 F.2d 595, 601 (7th Cir.1978) ("[T]he intent element of 18 U.S.C. § 1001 ... precludes a conviction for an honest misinterpretation of a government form.").

### III.

Stella raises principally four additional arguments on appeal:

> that the services, facilities, or supplies are those which commonly are obtained by institutions such as the provider from other organizations and are not a basic element of patient care ordinarily furnished directly to patients by such institutions; and that the charge to the provider is in line with the charge for such services, facilities, or supplies in the open market and no more than the charge made under comparable circumstances to others by the organization for such services, facilities, or supplies. In such cases, the charge by the supplier to the provider for such services, facilities, or supplies shall be allowable as cost.

---

5. Section 405.427(d) provides:

> *Exception.* An exception is provided to [the related organization] principle if the provider demonstrates by convincing evidence to the satisfaction of the fiscal intermediary (or, where the provider has not nominated a fiscal intermediary, the Health Care Financing Administration), that the supplying organization is a bona fide separate organization; that a substantial part of its business activity of the type carried on with the provider is transacted with others than the provider and organizations related to the supplier by common ownership or control and there is an open, competitive market for the type of services, facilities, or supplies furnished by the organization;

**234**

1. First, Stella contends, as he did in his motion for judgment notwithstanding the verdict below, that the conspiracy count of the indictment should have been dismissed because Jose A. Cardona-Alvarez, an unindicted co-conspirator and a chief witness for the prosecution, testified on cross-examination that the defendants neither intended nor agreed to defraud the government. Stella argues that, in the face of Cardona's denials, no rational finder of fact could have found him guilty of conspiracy beyond a reasonable doubt.

■ We disagree. As we recently observed in *United States v. Drougas*, 748 F.2d 8, 15 (1st Cir.1984) (citations omitted),

> The gist of conspiracy is an agreement to disobey or to disregard the law. Two types of intent must be proven: intent to agree and intent to commit the substantive offense.... A conspiratorial agreement may be proven by circumstantial as well as direct evidence.... "A common purpose and plan may be inferred from a development and collocation of circumstances." ... The government need not exclude every reasonable hypothesis inconsistent with guilt with respect to each piece of circumstantial evidence. Rather, "the question is merely whether the total evidence, including reasonable inferences, when put together is sufficient to warrant the jury to conclude that defendant is guilty beyond a reasonable doubt."

As *Drougas* makes clear, agreement and intent need not be proven by direct evidence; they may be inferred circumstantially. Furthermore, a conspiratorial agreement need not be express, but may consist of no more than a tacit understanding. *United States v. Pintar*, 630 F.2d 1270, 1275 (8th Cir.1980).

■ Here, although Cardona denied on cross-examination that he intended or agreed with Stella to defraud the government, there was ample evidence from which the jury could infer the contrary. For example, Cardona testified on direct that he revived Casa Cardona in 1973 at Stella's behest, that AAA Hospital Supply was created to supply the Hospital with medical equipment, and that AAA invoiced the Hospital for equipment that it was unable to purchase because, at Stella's direction, monies that AAA received from the lending institution to pay for equipment were used for payments to both Stella and Stella's personal creditors. In short, the jury could have found that Cardona's conclusions concerning his actions were squarely at odds with his actions themselves.

■ 2. Next, Stella argues, as he did below, that his convictions under counts two, three, and four of the indictment should be reversed, because the government failed to prove the materiality of the false representations made in connection with these counts. Counts two, three, and four all alleged violations of 18 U.S.C. § 1001 (1982).[6] As the Eleventh Circuit recently observed in *United States v. Lopez*, 728 F.2d 1359, 1362 (11th Cir.) (per curiam) (citations and footnotes omitted), *cert. denied*, —— U.S. ——, 105 S.Ct. 112, 83 L.Ed.2d 56 (1984),

> The requirement [in 18 U.S.C. § 1001] that the falsification be of a "material" fact, while only contained in the first clause of the statute, has been read into the entire statute so as to exclude trivial falsifications from its coverage.... To be "material," a falsification "must have a natural tendency to influence, or be capable of affecting or influencing, a government function." ... It makes no difference that a specific falsification did not exert influence so long as it had the *capacity* to do so.

As *Lopez* makes clear, the government need not demonstrate that the falsification *actually* influenced a government function, but only that it *might have* influenced a government function. *See also United States v. Notarantonio*, 758 F.2d 777, 785–86 (1st Cir.1985).

---

**6.** *See* note 2, *supra.*

Counts two, three, and four of the indictment charged Stella[7] with submitting letters to the HUD office in Hato Rey, Puerto Rico seeking authorization for the release of mortgage escrow monies to pay for, respectively, a "Pho/sonic Ultrasound Scanner," a "Dynacamera 4/15," and a "Titanos 800MA X-ray Unit" which, contrary to Stella's representations, had not been purchased through AAA Hospital Supply. At trial, the government presented evidence tending to show that the Pho/sonic Ultrasound Scanner was neither purchased through AAA nor received by the Hospital. Instead, Stella attempted to lease an ultrasound scanner from a company in Philadelphia, and purchased such a device only after this attempt failed. Because the HHS engineer responsible for verifying the Hospital's equipment acquisitions for HUD did not find an ultrasound scanner on the premises at the time of his inspections, no escrow funds were ever disbursed for the purchase of the scanner. As to the Dynacamera 4/15 and the Titanos X-ray Unit, the government's evidence tended to prove that, although the Hospital purchased both of these machines, they were not supplied by AAA as represented by Stella, but were supplied by other equipment companies who were not paid for this merchandise by the time the Hospital went into receivership in June of 1979.

With respect to all three of these counts, Stella argues that, because under the escrow deposit agreement only $447,000 was held by the Hospital's mortgagee, Merrill Lynch, Hubbard, Inc. for the purchase of hospital equipment, and the HHS engineer responsible for verifying equipment acquisitions for HUD accounted for over $600,000 worth of equipment on the premises, Stella's false representations were immaterial because they did not result in the disbursement of any monies that would not have been disbursed anyway. However, the test for materiality under 18 U.S.C. § 1001 is not whether a false statement actually influenced a government function,

but whether it had the capacity to influence a government function. *United States v. Notarantonio*, 758 F.2d at 785.

■ In the case at bar, Stella's falsifications were clearly capable of resulting in the fraudulent procurement of government funds. With respect to the Dynacamera 4/15 and the Titanos X-ray Unit, Stella's misrepresentations resulted in the disbursement of escrow monies not to the true vendors of the equipment, but to AAA Hospital Supply. Similarly, although HUD did not authorize the disbursement of escrow funds for the Pho/sonic Ultrasound Scanner, HUD plainly could have relied on Stella's misrepresentations to its detriment, because the HHS engineer might well have been tricked into believing that the Hospital had purchased an ultrasound scanner if Stella had been successful in leasing one.

3. Next, Stella contends that his conviction on counts eight and nine, the bankruptcy counts, should be reversed because the district court erred in denying his pretrial motion to sever these counts under Fed.R. Crim.P. 8(b). Rule 8(b) provides:

> *Joinder of Defendants.* Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Stella argues that the bankruptcy counts were improperly joined, because they were not part of "the same series of acts or transactions" that formed the basis for the remaining counts in the indictment.

In support of this contention, Stella relies in part on our analysis of Rule 8(b) in *United States v. Turkette*, 632 F.2d 896, 907–09 (1st Cir.1980), *rev'd on other grounds*, 452 U.S. 576, 101 S.Ct. 2524, 69

---

**7.** Alemany was also charged in this part of the indictment, but the jury acquitted him on all

three of these counts.

L.Ed.2d 246 (1981). However, in *Turkette* we observed that, while the term "series" in Rule 8(b) requires "something more than mere 'similar acts,'" the "[r]elatedness of offenses can be established by demonstrating that essentially the same facts must be shown for each of the consolidated crimes." 632 F.2d at 907–08.

Here, although counts eight and nine were not alleged as part of the conspiracy charged in count one of the indictment, they were interrelated with the substantive offenses charged in counts two through seven. For example, both counts eight and nine charged the defendants[8] with knowingly and fraudulently failing to disclose to the bankruptcy court that AAA Hospital Supply was one of the businesses operated by Stella during the three years previous to 1979. Plainly, the evidence necessary to prove that Stella operated AAA overlapped with the evidence necessary to prove the frauds alleged in the remaining counts of the indictment. *See United States v. O'Connell*, 703 F.2d 645, 648–49 (1st Cir.1983) (joinder of offenses under Rule 8(b) proper where "facts necessary to show guilt on the stolen goods charges made up an important subset of those needed to show guilt on the perjury charge").

4. Last, Stella argues that there was insufficient evidence to sustain his conviction on counts five, six, and seven. As Stella did not raise this issue below, it is not properly before us here. *United States v. Cox*, 752 F.2d 741, 747 (1st Cir. 1985). In any event, we have reviewed the record and, taking all the inferences that may reasonably be drawn therefrom in the light most favorable to the government, *United States v. Quejada-Zurique*, 708 F.2d 857, 859 (1st Cir.), *cert. denied*, 464 U.S. 855, 104 S.Ct. 173, 78 L.Ed.2d 156 (1983), we are satisfied that the evidence was more than sufficient to support Stella's conviction on these counts.

**IV.**

Alemany also raises several additional arguments on appeal:

1. First, Alemany contends that the district court erred in denying his motions for dismissal of. the indictment at the close of the government's case and, at the close of trial, for a judgment of acquittal notwithstanding the verdict, because there was insufficient evidence to support his conviction. Because the government concedes that its case against Alemany "is not an overwhelming one," we will review the evidence against Alemany in some detail.

Alemany was convicted on the conspiracy count of the indictment as well as on counts five and six, which alleged that the defendants had submitted and caused to be submitted false Medicare cost reports for 1977 and 1978. As to the conspiracy count, Alemany contends, *inter alia*, that contrary to the allegations contained in the indictment, the government failed to produce any evidence that he was involved in the concealment of the relationship between Casa Cardona, AAA Hospital Supply, and the Hospital, or that he derived any gains from the conspiracy.

We cannot agree. The government's evidence at trial tended to show that Alemany was employed as the Hospital's controller from May of 1976 to March of 1979, and that he was a skilled accountant familiar with the requirements of the Medicare Regulations. Mr. David Ramos-Usero, a former auditor for Blue Cross of Florida, testified that in July of 1978 he attended a meeting with Alemany and other representatives of the Hospital at which Ramos informed the Hospital representatives that he believed there was a related organization problem with respect to the Hospital's 1976 and 1977 cost reports. Mr. Ramos explained that the basis for Blue Cross's concern was that it appeared that Jose Cardona was working for Casa Cardona and AAA Hospital Supply as well as the Hospital, and was in a position to influence all three of these corporations. In response, Alemany denied that the three cor-

---

**8.** Alemany was acquitted by the jury on both of these counts.

porations were related, because Stella was the only one who made decisions for the Hospital.

Sometime after this meeting, Ramos went to the Puerto Rico Department of State and obtained copies of two letters addressed to the Department which indicated that Stella was the corporate president of both Casa Cardona and AAA Hospital Supply. When Ramos telephoned Alemany and confronted him with this information, Alemany told Ramos that the letters were in error and would be corrected, but Ramos never heard from Alemany again on this subject.

 Furthermore, although Alemany contends that there was no evidence that he profited in any way from the conspiracy, there was testimony that Stella permitted Alemany and one Dr. Edgardo Grovas-Rodriguez to operate a corporation known as the Hato Rey Medical Group out of the Hospital from July of 1977 until early 1979, and that a $190,000 debt owed by the Medical Group to the Hospital was written off the Hospital's books in 1979 while Alemany was working as the assistant to the Hospital's fiduciary in bankruptcy, James Stuckey. Thus, while there may have been no evidence that Alemany had a direct financial stake in the fraudulent diversion of mortgage funds through Casa Cardona and AAA Hospital Supply, there was evidence from which the jury could have inferred that Alemany profited in other ways by cooperating with Stella and furthering the aims of the conspiracy.[9]

 In light of this evidence, and given Alemany's position of authority within the Hospital and his control of the Hospital's accounting department, the jury was not obliged to believe that he was an unwitting pawn in a covert conspiracy between Stella and Cardona. We said in *United States v. Marsh*, 747 F.2d 7, 13 (1st Cir.1984), "if the government proves beyond a reasonable doubt at least a slight, though willing and knowing, connection between a defendant

and a conspiracy, an appellate court will affirm the defendant's participation in that conspiracy." Although the evidence implicating Alemany in the conspiracy was largely circumstantial, we are satisfied that, viewed in the light most favorable to the government, it was sufficient to have persuaded a rational jury of the fact that Alemany was guilty beyond a reasonable doubt. *See, e.g., United States v. Cincotta*, 689 F.2d 238, 240–41 (1st Cir.), *cert. denied*, 459 U.S. 991, 103 S.Ct. 347, 74 L.Ed.2d 387 (1982).

As to count five of the indictment, Alemany argues that there was insufficient evidence to convict him of falsifying the 1977 Medicare cost report, because the cost report was based on certified financial statements prepared not by him, but by an independent accounting firm which also prepared the financial statements for Casa Cardona and AAA Hospital Supply. Similarly, with respect to count six of the indictment, Alemany contends that he could not have played any part in falsifying the 1978 Medicare cost report, because he left his position as Hospital controller in March of 1979, the cost report was submitted by his successor in April, and Alemany did not return to work at the Hospital as an assistant to the fiduciary in bankruptcy until May of 1979.

 We think there was sufficient evidence on both of these counts to support Alemany's conviction. Not only was Alemany listed as one of the preparers of the 1977 cost report, but he signed the transmittal letter that was sent with the report to Blue Cross of Florida. Although Alemany was not employed at the Hospital when the 1978 cost report was submitted to the Cooperativa de Seguros de Vida de Puerto Rico in April of 1979, Alemany's successor, Mr. Abel Lopez, testified that he frequently consulted with Alemany during this period on Hospital accounting matters. There was also evidence to suggest that the 1978 cost report was prepared from trial bal-

---

**9.** A defendant, of course, may be guilty of participation in a criminal conspiracy without actually profiting from or having any financial stake

in it. *See, e.g., United States v. Noah*, 475 F.2d 688, 697 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 119, 38 L.Ed.2d 54 (1973).

ances created during Alemany's tenure as controller. A conviction under 18 U.S.C. § 1001 can rest on evidence that the defendant knowingly and wilfully caused a false statement to be made to a government agency; the defendant need not have prepared the statement himself. *United States v. Mouton*, 657 F.2d 736 (5th Cir. 1981).

 2. Next, Alemany argues that the district court committed reversible error in denying his motion for severance of his trial from that of Stella under Fed.R. Crim.P. 14. A severance motion made pursuant to Rule 14 is a matter for the district court's discretion, and we will reverse the denial of such a motion only if the defendant is able to make a strong showing that the denial deprived him of a fair trial. *United States v. Bautista*, 731 F.2d 97, 99–100 (1st Cir.1984); *United States v. Arruda*, 715 F.2d 671, 679 (1st Cir.1983). Here, Alemany contends in conclusory fashion that he was unfairly prejudiced by the "spillover effect" of the government's case against Stella, and effectively found guilty by association. The district judge, however, expressly cautioned the jury that it was their duty "to give separate personal consideration to the case of each individual defendant." Alemany was acquitted on six of the nine counts with which he was charged. Thus, it would appear that the jury, in fact, gave individualized attention to his case. *United States v. Greenleaf*, 692 F.2d 182, 187 (1st Cir.1982), *cert. denied*, 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983); *United States v. Tashjian*, 660 F.2d 829, 834 (1st Cir.), *cert. denied*, 454 U.S. 1102, 102 S.Ct. 681, 70 L.Ed.2d 646 (1981).

3. Last, Alemany argues that his sentence of ten years in prison and a $10,000 fine, although within the statutory limits of the crimes for which he was convicted, cannot stand because the district judge imposed the sentence mechanistically, without giving individualized consideration to the mitigating factors in his case. The record of the proceedings at Alemany's sentencing hearing has been lost, but the government has filed a summary of these proceedings without objection from the defendant.

We have reviewed the government's summary, and are satisfied that there is no merit to Alemany's contentions. Not only did the district judge specifically advert to certain factors that he viewed as aggravating Alemany's conduct but, at the close of the proceedings, he informed the parties of aggravating factors in the presentence report that he had excluded from his deliberations, even though they had apparently not been objected to by the defendant. Alemany's sentence was within the bounds of the district court's discretion, and we see no defect in the manner in which it was imposed. We have no authority to change it. *See United States v. Pasarell*, 727 F.2d 13, 17–18 (1st Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 107, 83 L.Ed.2d 51 (1984).

*Affirmed.*